761 F.2d 1187
 9 Soc.Sec.Rep.Ser. 364, Medicare&Medicaid Gu 34,610
STATE OF OHIO, DEPARTMENT OF MENTAL RETARDATION AND
DEVELOPMENTAL DISABILITIES; Department of Public
Welfare, Petitioners,
v.
UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,
HEALTH CARE FINANCING ADMINISTRATION, Respondent.
 No. 84-3181.
 United States Court of Appeals,
Sixth Circuit.
 Argued Feb. 12, 1985.
Decided May 17, 1985.
 
 C. William Brownfield, argued, Alex Shumate, Brownfield, Bally & Goodman, Columbus, Ohio, for petitioners.
 Alan S. Dorn, argued, Gen. Counsel, U.S. Dept. of H.H.S., Chicago, Ill., for respondent.
 William D. Ginn, David T. Smorodin, Thompson, Hine & Flory, Cleveland, Ohio, amici curiae Lucy Idol Center for the Handicapped & Help, Inc.
 Before LIVELY, Chief Judge, MARTIN, Circuit Judge, and BROWN, Senior Circuit Judge.
 LIVELY, Chief Judge.
 
 
 1
 This case requires the court to decide whether the State of Ohio (Ohio) is entitled to federal financial assistance under the Medicaid Act, Title XIX of the Social Security Act, 42 U.S.C. Sec. 1396 et seq. (1982), for a proposed program of assistance to mentally retarded and developmentally disabled persons.
 
 I.
 A.
 
 2
 A purpose of the Medicaid Act, as set forth in 42 U.S.C. Sec. 1396, is to authorize payments to the states which enable them to provide (1) "medical assistance" to disabled individuals "whose income and resources are insufficient to meet the costs of necessary medical services," and (2) "rehabilitation and other services" to help such individuals "attain or retain capability for independence or self-care." Title XIX, which created medicaid, was added to the Social Security Act in 1965. It requires each state to adopt a plan for administration of programs of medical assistance for the needy, and to have an agency responsible for establishing and maintaining standards for medical institutions included under the plan. The Act contains detailed requirements with which a state plan for medical assistance must comply in order to be approved for federal funding. 42 U.S.C. Sec. 1396a(a). Payments may be made to the states only under a plan which complies with the requirements of Sec. 1396a. 42 U.S.C. Sec. 1396b. Ohio has an approved state plan.
 
 B.
 
 3
 Ohio submitted an amendment to its Medicaid state plan to the Health Care Financing Administration (HCFA) of the Department of Health and Human Services (HHS) on March 29, 1982. Under the proposed amendment Ohio sought federally funded medicaid financing for services to be provided to mentally retarded and developmentally disabled individuals in state-certified freestanding facilities known as "habilitation centers." Services were to be provided on an outpatient basis, and only upon the recommendation of a physician or other licensed medical practitioner.
 
 
 4
 In the amendment the state referred to these services as "developmental services provided by habilitation centers," and described the services generally as:
 
 
 5
 [T]hose medical or remedial services recommended by a physician or other licensed practitioner of the healing arts which raise the level of personal, social, physical, vocational, or emotional efficiency of an MR/DD person to enable that person to acquire and maintain skills necessary to cope more effectively with his/her environment and to achieve his/her best possible functional level. ["MR/DD" is medicaid jargon for mentally retarded and developmentally disabled.]
 
 
 6
 There followed a listing of eighteen specific types of service to be included and one "catch all" category.
 
 
 7
 The staff in HCFA's regional office advised the Ohio Department of Public Welfare that the amendment could not be approved because it covered nonmedical services for which medicaid funding was not available. After further discussion Ohio substituted a list of seven more broadly-worded categories of services for the original nineteen. This change did not satisfy HCFA and on June 7, 1982 the regional administrator requested more information about the proposed services and the individuals who would be recommending them. In this letter the regional administrator requested Ohio to distinguish between "habilitative services" and "rehabilitative services," and asked Ohio to identify which proposed services were "habilitative" and which were "rehabilitative." Ohio responded that the words were synonomous in the context of Title XIX. The regional administrator forwarded the proposed amendment to the administrator in Washington, who, with the concurrence of the Secretary of HHS, disapproved it as providing nonmedical services not subject to federal funding under the Medicaid Act.
 
 
 8
 The administrator explained her reasoning as follows: Habilitative services are nonmedical in nature, focusing on the development and maintenance of life skills rather than treatment of specific medical problems. Title XIX supplies funding for these nonmedical services only when they are provided as part of the total services of an intermediate care facility for the mentally retarded (ICF/MR), that is, in an institutional setting; or as part of an approved program meeting the requirements of section 1915(c) of the Social Security Act, 42 U.S.C. Sec. 1396n(c) (a "waiver" program).
 
 C.
 
 9
 Ohio sought reconsideration of this decision and was granted a hearing. Among other evidence the State presented testimony of an expert that "habilitation" and "rehabilitation" refer to the same types of treatment and remedial programs, the former applying to efforts to deal with disabilities present at birth or acquired at an early age, and the latter applying to efforts to deal with disabilities acquired later in life and resulting from injury or illness. Ohio argued that there is nothing in the Medicaid Act to suggest that this distinction should have any relevance to coverage. Since "rehabilitative services" are specifically included within the definition of "medical assistance," the same coverage should be accorded habilitative services. There being no distinction between habilitative and rehabilitative services, the disapproval of Ohio's proposed amendment was based on a faulty premise.
 
 
 10
 The hearing officer recommended approval of the amendment. He concluded that habilitative services which are medical or remedial in nature are covered by the term "rehabilitative services" in Sec. 1396d(a)(13) and that Ohio's proposed amendment offered services which are primarily medical or remedial in nature. The hearing officer also concluded that the Act does not preclude coverage of outpatient services which are medical or remedial in nature. The administrator did not accept the recommendation of the hearing officer. She concluded that the proposed amendment included nonmedical services and since Ohio had not described sufficiently the services included under the amendment it had not met its burden of showing that all included services were medical. The administrator accepted HCFA's argument that habilitative services may be covered under Title XIX only for those individuals in an intermediate care facility for the mentally retarded or as part of a program of home and community-based services approved under waiver authority. Prior to the 1981 enactment of home and community-based waiver authority, the only habilitative services authorized by Title XIX were "ICF/MR [intermediate care facilities for the mentally retarded] services." Since the services proposed in the plan amendment were not to be offered to patients in intermediate care facilities or pursuant to a waiver, the plan could not be approved. The administrator also determined that Ohio's proposed program would violate "comparability" requirements of Title XIX. This became the "final determination" of the Secretary of HHS, and Ohio has petitioned for review pursuant to 42 U.S.C. Sec. 1316(a)(3).
 
 II.
 
 11
 On appeal Ohio makes several contentions. First, it argues that the Secretary erred in disapproving the amendment on the ground that the services to be provided are "habilitative" rather than "rehabilitative," and therefore are not medical or remedial in nature. Ohio also contends that the Secretary erred in disapproving the amendment on the ground that it would deny comparability of rehabilitative services to persons qualified to receive them. In addition, Ohio asserts that it met its burden of showing that the plan amendment complied with the requirements of Title XIX and that the Secretary's denial of federal medicaid funding to mentally retarded and developmentally disabled persons under the plan amendment constituted a denial of equal protection of the laws.
 
 
 12
 Ohio was joined as amici curiae by two institutions which utilize outpatient treatment and therapy to help mentally retarded and developmentally disabled patients. In addition to supporting Ohio's arguments that the plan amendment complies with the requirements of the Act, amici assert that this is not a case where the court should accord substantial deference to HCFA's construction of the statute. This is so, amici contend, because the case does not arise out of facts or circumstances within an area of special expertise of HCFA. It is a case of first impression, they maintain, where the court is required to determine, free of any rule of deference, whether the Secretary has misconstrued a statute. There is no longstanding construction which has acquired the patina of authenticity through years of acceptance.
 
 
 13
 The Secretary responds that our review is limited to determining whether the action of HCFA was "arbitrary, capricious, or an abuse of discretion" and that an extraordinary degree of deference must be given decisions concerning medicaid because of the complex nature of the program. The Secretary also argues that her determination that Ohio failed to demonstrate that the proposed services under the plan amendment are covered by Title XIX must be upheld by the court if supported by substantial evidence.
 
 
 14
 The Secretary maintains that HCFA correctly determined that the plan amendment describes services which are nonmedical in nature and that Ohio failed to identify and delete these from its plan. In particular the Secretary contends that those services for mentally retarded and developmentally disabled individuals which are "habilitative" in nature are not reimbursable under Title XIX except in an intermediate care facility for the mentally retarded or under a waiver. The Secretary also argues that Ohio's proposal would violate the medicaid requirement of comparability of services among all beneficiaries. Finally, the Secretary denies that disapproval of the plan amendment discriminates on the basis of mental retardation.
 
 III.
 A.
 
 15
 "Medical assistance" is the key phrase throughout the Medicaid Act, and the one upon which decision of this case must turn. The centrality of "medical assistance" is best illustrated by the first section of Title XIX, 42 U.S.C. Sec. 1396:
 
 
 16
 For the purpose of enabling each State, as far as practicable under the conditions in such State, to furnish (1) medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services, and (2) rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care, there is hereby authorized to be appropriated for each fiscal year a sum sufficient to carry out the purposes of this subchapter. The sums made available under this section shall be used for making payments to States which have submitted, and had approved by the Secretary of Health and Human Services, State plans for medical assistance.
 
 
 17
 The Act lists eighteen types of care and services which are included in the term "medical assistance." 42 U.S.C. Sec. 1396d(a). Among these are, "medical care, or any other type of remedial care recognized under state law, furnished by licensed practitioners within the scope of their practice as defined by state law," Sec. 1396d(a)(6); and, "other diagnotistic, screening, preventive, and rehabilitative services," Sec. 1396d(a)(13). The term "rehabilitative services" is not defined in the Act, but an HCFA implementing regulation defines it as follows:
 
 
 18
 "Rehabilitative services," except as otherwise provided under this subpart, includes any medical or remedial services recommended by a physician or other licensed practitioner of the healing arts, within the scope of his practice under State law, for maximum reduction of physical or mental disability and restoration of a recipient to his best possible functional level.
 
 
 19
 42 C.F.R. Sec. 440.130(d) (1984).
 
 
 20
 In its plan amendment Ohio referred to Sec. 1396d(a)(13) and sought approval for rehabilitative services. However, it went on to describe these services as "developmental services provided by habilitation centers" that would enable a mentally retarded or developmentally disabled person "to acquire and maintain skills necessary to cope with his/her environment and to achieve his/her best possible functional level." As first submitted, its plan amendment contained such categories as homemaker services and recreation and sex education as well as physical and speech therapy. When Ohio resubmitted the plan it used general descriptions of services which were broad enough to suggest that some of the previously described nonmedical services would still be available under the plan.
 
 
 21
 Neither developmental services nor habilitation centers are referred to in Title XIX. The only references to "habilitative services" are found in regulations relating to intermediate care facilities for the mentally retarded and the statute authorizing the so-called waiver based program. "Intermediate care facility services" is one of the eighteen categories of medical assistance listed in Sec. 1396d(a) and is defined in Sec. 1396d(d):
 
 
 22
 The term "intermediate care facility services" may include services in a public institution (or distinct part thereof) for the mentally retarded or persons with related conditions if--
 
 
 23
 (1) the primary purpose of such institution (or distinct part thereof) is to provide health or rehabilitative services for mentally retarded individuals and which meet such standards as may be prescribed by the Secretary;
 
 
 24
 The regulation which sets standards for intermediate care facilities requires that they provide "training and habilitation services" defined by the regulation as "those intended to aid the intellectual, sensorimotor, and emotional development of a resident." 42 C.F.R. Sec. 442.401. The only use of the term "habilitation services" in the Medicaid Act appears in the 1981 amendment now codified at 42 U.S.C. Sec. 1396n(c) which permits the Secretary to provide by waiver that a state plan may include as medical assistance payment of the cost of home or community-based services for individuals who would otherwise require the level of care provided in a skilled nursing facility or intermediate care facility. Among the services which may be provided under such a waiver are
 
 
 25
 medical assistance to individuals (to the extent consistent with written plans of care, which are subject to the approval of the State) for case management services, homemaker/home health aide services and personal care services, adult day health services, habilitation services, respite care, and such other services requested by the State as the Secretary may approve.
 
 
 26
 42 U.S.C. Sec. 1396n(c)(4)(B) (emphasis added).
 
 B.
 
 27
 The Secretary does not deny that some habilitation services are included in the term "rehabilitation services." However, she maintains that only habilitative services directed toward a specific medical condition such as loss of the use of a limb, are covered. The object of habilitation programs is to deal with the overall needs of mentally retarded and developmentally disabled persons and not just their medical needs. Thus, most habilitative services are social and educational rather than medical, and do not fall within medicaid coverage as "rehabilitative services." Congress required prior to the 1981 amendment that these nonmedical services be provided only as part of the complete program of an intermediate care facility and in the 1981 amendment authorized funding for outpatient habilitation services for the first time but subject to the waiver provisions of Sec. 1396n(c).[1] These "home or community-based services" must be provided pursuant to a written plan of care and only to individuals who would require institutionalization if the services were not available. 42 U.S.C. Sec. 1396n(c)(1). Reduced to its essence the argument of the Secretary appears to be that federal funding is authorized for certain nonmedical habilitation services only when they are provided to mentally retarded individuals in intermediate care facilities, or as outpatients if the waiver requirements are met. There is no provision in Title XIX for funding a program of habilitation services in the manner proposed by Ohio.
 
 
 28
 This position finds support in the legislative history of the 1981 amendment. Senate Report No. 97-139 accompanying the Omnibus Budget Reconciliation Act, which included the amendment, contained a section titled "Nonmedical Services for Certain Individuals," which stated:
 
 
 29
 Present law --Federal matching under medicaid is only available for services which are primarily medical in nature. Certain associated services are not eligible for Federal matching payments. However, these services while not strictly medical in nature may in fact contribute to improved health, and could potentially postpone or prevent institutionalization. To the extent that institutionalization is deferred or avoided, certain cost savings may result.
 
 
 30
 Committee amendment --The bill permits the Secretary to waive the current definition of covered medicaid services to include certain nonmedical support services.... Such services could include case management, supervised living, home services and nonmedical rehabilitation services approved by the Secretary. * * *
 
 
 31
 S.Rep. No. 97-139, reprinted in [1981] 2 U.S.Code Cong. & Ad.News 396, 747-48. In House Conference Report No. 97-208 the Committee of Conference wrote that additional services which might be included in a state plan
 
 
 32
 are homemaker/home health aide personal care services; adult day health; habilitation, case management; respite care; and other services requested by the State and approved by the Secretary.... Habilitation encompasses both health and social services needed to insure optimal functioning of the mentally retarded and developmentally disabled.
 
 
 33
 U.S.Code Cong. & Ad.News, supra, 1010, 1328.
 
 C.
 
 34
 Ohio responds that its plan amendment referred to rehabilitative services, and that such services had been authorized for federal funding from the inception of the medicaid program. It points to the reference to "rehabilitative and other services" in Sec. 1396 and to the definition of medical assistance in Sec. 1396d(a)(6) which includes "medical care, or any other type of remedial care recognized under State law, furnished by licensed practitioners within the scope of their practice as defined by State law." The State insists that there is no difference between "rehabilitative" and "habilitative" services; the only distinction lies in the time of onset of the condition requiring the services, and not in the services provided. For persons afflicted from birth or who become afflicted at a very young age, services designed to bring them up to their optimum level of achievement are "habilitative." On the other hand, when a person requires identical services because of an injury or illness suffered later in life, the services are "rehabilitative," i.e., designed to restore the patient, rather than bring him or her to the optimun level of achievement for the first time.
 
 
 35
 The Secretary erred, according to Ohio, by seizing on the reference to "habilitation centers" in its plan amendment and concluding that it sought funding for services that had not traditionally been included among medicaid-eligible services. From the beginning it has been a purpose of the medicaid program to provide funding for remedial services to mentally retarded and developmentally disabled individuals, although these conditions are different from acute physical illnesses and require different kinds of treatment.
 
 IV.
 
 36
 Review of agency action is controlled by the Administrative Procedure Act, 5 U.S.C. Sec. 551 et seq. (1982). The scope of review is prescribed in 5 U.S.C. Sec. 706 which requires a reviewing court to interpret statutory provisions and to "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."
 
 A.
 
 37
 In construing a statute we are required to give deference to longstanding interpretations made by the agency responsible for its administration. United States v. Clark, 454 U.S. 555, 565, 102 S.Ct. 805, 812, 70 L.Ed.2d 768 (1982). Such a construction is not controlling, however, and the court must make an independent determination of the meaning. United States v. National Association of Securities Dealers, 422 U.S. 694, 719, 95 S.Ct. 2427, 2442, 45 L.Ed.2d 486 (1975). The Supreme Court summarized the duty of the courts where the meaning of a statute is in doubt in Volkswagenwerk v. FMC, 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968):
 
 
 38
 The construction put on a statute by the agency charged with administering it is entitled to deference by the courts, and ordinarily that construction will be affirmed if it has a "reasonable basis in law." NLRB v. Hearst Publications, 322 U.S. 111, 131 [64 S.Ct. 851, 860, 88 L.Ed. 1170]; Unemployment Commission v. Aragon, 329 U.S. 143, 153-154 [67 S.Ct. 245, 250, 91 L.Ed. 136]. But the courts are the final authorities on issues of statutory construction, FTC v. Colgate-Palmolive Co., 380 U.S. 374, 385 [85 S.Ct. 1035, 1042, 13 L.Ed.2d 904], and "are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." NLRB v. Brown, 380 U.S. 278, 291 [85 S.Ct. 980, 988, 13 L.Ed.2d 839].
 
 
 39
 See also Federal Election Commission v. Democratic Senatorial Campaign Committee, 454 U.S. 27, 32, 102 S.Ct. 38, 70 L.Ed.2d 23 (1981) ("the courts remain the final authorities on issues of statutory construction" and "must reject administrative constructions ... that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement.").
 
 
 40
 The foregoing rules are easier to state than apply. In the present case there is no longstanding, consistent construction of the Medicaid Act which prohibits funding "habilitative services." So far as this record discloses, the issue has never been addressed by HCFA prior to this case. This being so, the issue is not so much one of deference as it is whether the agency's interpretation is logical and consistent with congressional intent, that is, has a "reasonable basis in law."
 
 B.
 
 41
 The seven categories of services listed in the final version of the plan amendment are: Assessment/Diagnosis; Medical/Nursing; Psycho-Social Services; Occupational Habilitation Services; Physical Habilitation Services; Speech and Language Habilitation Services and Transportation Services. It is clear that not all of these are medical in nature. The Medicaid Act is not written so narrowly, however. From its inception the Act has authorized funding for rehabilitative services as well as medical services. Both are included under the more general rubric "medical assistance." The Secretary appears to acknowledge that rehabilitative services include social as well as medical services. Indeed, the statute itself speaks of "rehabilitation and other services." However, the Secretary states that Ohio's "habilitation centers" perform nonmedical services which are not covered by any definition in the Act and that the plan cannot be approved because Ohio will not separate the services and designate those which are covered by the "rehabilitation services" provision.
 
 C.
 
 42
 If this were nothing more than a semantical disagreement over whether there is a difference between "rehabilitative" and "habilitative" services we would be inclined to conclude that the Secretary's action was arbitrary and withhold approval. However, there is support in the legislative history for the Secretary's position. In enacting the 1981 amendment Congress appears to have intended to provide medicaid funding for "certain associated services" not previously eligible. However, this new eligibility was limited to approved programs operated under a waiver from the general requirement that such services be provided as part of the total program of an intermediate care facility.
 
 
 43
 It is impossible to review this record with any assurance that the issues have been fully developed. The Secretary has not held to a consistent position throughout the proceedings. Nevertheless, it appears that she has made the fact that Ohio proposes to provide services at "habilitation centers" the basis of her disapproval of the plan. However, the fact that Ohio proposes to provide services to mentally retarded and developmentally disabled individuals in facilities which it calls "habilitation centers" is not determinative. Its plan amendment proposes to offer "rehabilitative services," a category included in the definition of "medical assistance." 42 U.S.C. Sec. 1396. The pertinent regulation makes rehabilitative services reimbursable as medical assistance and defines such services to include "any medical or remedial services recommended by a physician or other licensed practitioner of the healing arts, within the scope of his practice under State law, for maximum reduction of physical or mental disability and restoration of a recipient to his best possible functional level." 42 C.F.R. Sec. 440.130(d) (emphasis added).
 
 
 44
 The proposed amendment would provide rehabilitative services to enable mentally retarded and developmentally disabled persons to "acquire and maintain skills necessary to cope more effectively with his/her environment and to achieve his/her best possible functional level." This clearly reflects the language of 42 U.S.C. Sec. 1396: "rehabilitation and other services to help such ... individuals attain or retain capability for independence or self-care...." On its face the plan amendment appears to propose the offering of services--however denominated--which fall within provisions of the Act.
 
 
 45
 The problem with the plan, however, is that Ohio has used descriptions of the services it proposes to offer which the Secretary construes as making at least some of them nonreimbursable under the Act. The parties were diverted by the difference--or lack thereof--between "habilitative" and "rehabilitative" services and never completed the process of describing accurately the services to be performed and determining whether all of them are covered and reimbursable. We conclude that the best solution is to remand the proceedings for further amplification. Putting aside the argument over "habilitative" and "rehabilitative," Ohio must be given an opportunity to demonstrate that the services which it proposes to provide at habilitation centers fall within "medical assistance" as defined in Title XIX. If, after such effort by Ohio, the Secretary reasonably determines that the services were not covered by the definition of "medical assistance" prior to the 1981 amendment, but do qualify as "associated services" under that amendment, then Ohio shall be given an opportunity to provide them under a waiver plan pursuant to 42 U.S.C. Sec. 1396n(c).
 
 
 46
 Ohio is attempting to provide services to mentally retarded and developmentally disabled individuals outside of institutions. This is a goal which accords with the most advanced thinking on the subject of treating such individuals. The Medicaid Act gives the states considerable latitude in determining the scope of their respective medicaid programs. Beal v. Doe, 432 U.S. 438, 444, 97 S.Ct. 2366, 2370, 53 L.Ed.2d 464 (1977). We believe the underlying purposes of the Medicaid Act will be served by returning this case to the Secretary for further proceedings.
 
 
 47
 Accordingly, the decision of the Secretary is vacated, and the cause is remanded for further proceedings consistent with this opinion.
 
 
 
 [1]
 42 U.S.C. Sec. 1396n(c)(1) provides:
 The Secretary may by waiver provide that a State plan approved under this subchapter may include as "medical assistance" under such plan payment for part or all of the cost of home or community-based services (other than room and board) approved by the Secretary which are provided pursuant to a written plan of care to individuals with respect to whom there has been a determination that but for the provision of such services the individuals would require the level of care provided in a skilled nursing facility or intermediate care facility the cost of which could be reimbursed under the State plan.